**Sandra G. BUNDY, Appellant,**

v.

**Delbert JACKSON, Director, D.C. Department of Corrections.**

**No. 79–1693.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 26, 1980.

Decided Jan. 12, 1981.

---

**20.** 138 NLRB 550 (1962).

**21.** *NLRB v. R. J. Smith Construction Co.,* 178 U.S.App.D.C. 109, 114, 545 F.2d 187, 192 (1976).

Barry H. Gottfried, Washington, D. C., with whom Arthur D. Chotin and Arthur Kahn, New York City, were on the brief, for appellant.

Leo N. Gorman, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corporation Counsel, Washington, D. C., were on the brief, for appellee. Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C., also entered an appearance for appellee.

Vella M. Fink, Atty., E. E. O. C., for amicus curiae Equal Employment Opportunity Commission, urging reversal. Beatrice Rosenberg, Asst. General Counsel, and Marilyn S. G. Urwitz, Atty., E. E. O. C., Washington, D. C., were on the brief for amicus curiae Equal Employment Opportunity Commission.

Linda F. Thome, Washington, D. C., was on the brief for amicus curiae Women's Legal Defense Fund, urging reversal.

Before J. SKELLY WRIGHT, Chief Judge, and SWYGERT * and ROBINSON, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

In *Barnes v. Costle,* 561 F.2d 983 (D.C. Cir. 1977), we held that an employer who abolished a female employee's job to retaliate against the employee's resistance of his sexual advances violated Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.* (1976 & Supp. III 1979). The appellant in this case asserts some claims encompassed by the *Barnes* decision, arguing that her rejection of unsolicited and offensive sexual advances from several supervisors in her agency caused those supervisors unjustifiably to delay and block promotions to which she was entitled. Equally important, however, appellant asks us to extend *Barnes* by holding that an employer violates Title VII merely by subjecting female employees to sexual harassment, even if the employee's resistance to that harassment does not cause the employ-

* Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

er to deprive her of any tangible job benefits.

The District Court in this case made an express finding of fact that in appellant's agency "the making of improper sexual advances to female employees [was] standard operating procedure, a fact of life, a normal condition of employment," Finding of Fact No. 38, Appellant's Appendix (App.) 15, and that the director of the agency, to whom she complained of the harassment, failed to investigate her complaints or take them seriously, *id.* No. 44, App. 16. Nevertheless, the District Court refused to grant appellant any declaratory or injunctive relief, concluding that sexual harassment does not in itself represent discrimination "with respect to * * * terms, conditions, or privileges of employment" within the meaning of Title VII, 42 U.S.C. § 2000e–2(a)(1) (1976). Further, the court denied appellant's request for back pay to compensate for the allegedly improper delay in her promotion to GS–9, and for elevation to GS–11 and back pay for the delay in that promotion, holding that the employer had independent, legitimate reasons for delaying and denying the promotions.

Because we believe the District Court wrongly construed Title VII on the claim for declaratory and injunctive relief and failed to apply the proper burden of proof analysis to the promotion claims, we reverse.[1]

## I. BACKGROUND

Appellant Sandra Bundy is now, and was at the time she filed her lawsuit, a Vocational Rehabilitation Specialist, level GS–9, with the District of Columbia Department of Corrections (the agency). Bundy began with the agency as a GS–4 Personnel Clerk in 1970, was promoted to GS–5 that same year, and became a GS–6 Staffing Technician in the Personnel Department in 1973. After training as a technician in employment staffing, she became a GS–7 Employment Development Specialist (the predecessor classification to Vocational Rehabilitation Specialist) in 1974, and achieved her current GS–9 level in 1976, one year after she filed her formal complaint of sexual harassment with the agency. In recent years Bundy's chief task has been to find jobs for former criminal offenders.

The District Court's finding that sexual intimidation was a "normal condition of employment" in Bundy's agency finds ample support in the District Court's own chronology of Bundy's experiences there. Those experiences began in 1972 when Bundy, still a GS–5, received and rejected sexual propositions from Delbert Jackson, then a fellow employee at the agency but now its Director and the named defendant in this lawsuit in his official capacity. Findings of Fact Nos. 28–29, App. 11–12. It was two years later, however, that the sexual intimidation Bundy suffered began to intertwine directly with her employment, when she received propositions from two of her supervisors, Arthur Burton and James Gainey.

Burton became Bundy's supervisor when Bundy became an Employment Development Specialist in 1974. Shortly thereafter Gainey became her first-line supervisor and Burton her second-line supervisor, although Burton retained control of Bundy's employ-

---

1. Bundy's complaint and, originally, her appeal also included a claim that the agency had illegally delayed her promotion to GS–9, for which she was found fully qualified in January 1976, until July of that year, in alleged retaliation against her filing a discrimination complaint. Aquila Gilmore, who was Chief Equal Employment Opportunity Officer for the agency, admitted at trial that he delayed the promotion in response to Bundy's filing of her complaint, Finding of Fact No. 46, Appellant's Appendix (App.) 17, but contended that he had done so in the good faith belief that the delay was authorized under District of Columbia regulations, Defendant's Exh. No. 18, Appellant's Supplemental Appendix (SA) 296. Before oral argument, however, appellee District of Columbia conceded that Gilmore had been wrong in delaying the promotion and offered Bundy back pay for the delay. The District believes, however, that Bundy is entitled only to four, rather than five, months' back pay since, even if Gilmore had not delayed the promotion, normal procedures would have delayed Bundy's formal elevation for one month after she was declared officially qualified. On remand the District Court can determine the proper amount of back pay as a remedy for appellee's error here.

ment status. *Id.* Nos. 32–33, App. 12. Burton began sexually harassing Bundy in June 1974, continually calling her into his office to request that she spend the workday afternoon with him at his apartment and to question her about her sexual proclivities. *Id.* No. 34, App. 12–13.[2] Shortly after becoming her first-line supervisor Gainey also began making sexual advances to Bundy, asking her to join him at a motel and on a trip to the Bahamas. *Id.* No. 35, App. 13–14. Bundy complained about these advances to Lawrence Swain, who supervised both Burton and Gainey. Swain casually dismissed Bundy's complaints, telling her that "any man in his right mind would want to rape you," *id.* No. 37, App. 14, and then proceeding himself to request that she begin a sexual relationship with him in his apartment. *Id.* No. 36, App. 14. Bundy rejected his request.

We add that, although the District Court made no explicit findings as to harassment of other female employees, its finding that harassment was "standard operating procedure" finds ample support in record evidence that Bundy was not the only woman subjected to sexual intimidation by male supervisors.[3]

In denying Bundy any relief, the District Court found that Bundy's supervisors did not take the "game" of sexually propositioning female employees "seriously," and

that Bundy's rejection of their advances did not evoke in them any motive to take any action against her. *Id.* No. 38, App. 15. The record, however, contains nothing to support this view, and indeed some evidence directly belies it. For example, after Bundy complained to Swain, Burton began to derogate her for alleged malingering and poor work performance, though she had not previously received any such criticism. App. 30. Burton also arranged a meeting with Bundy and Gainey to discuss Bundy's alleged abuse of leave, though he did not pursue his charges at this meeting. App. 94–95.

Beyond these actions, Bundy's supervisors at least created the impression that they were impeding her promotion because she had offended them, and they certainly did nothing to help her pursue her harassment claims through established channels. Bundy became eligible for promotion to GS–9 in January 1975. App. 178. When she contacted Gainey to inquire about a promotion he referred her to Burton, who then referred her back to Gainey, who then told her that because of a promotion freeze he could not recommend her for a promotion. App. 41–43. One month later, however, Bundy learned that the personnel office had indeed recommended other employees for promotion despite the freeze. App. 44.

2. Burton called Bundy into his office to ask about her weekend activities and, in particular, whether she liked horses. When she responded that she indeed rode horses, he said that he had heard that women rode horses to obtain sexual relief. He told her he had books and pictures at home to support this theory and suggested that she come to his apartment to see them. Burton specifically asked her to come to his apartment to look at the books and pictures during the workday afternoon instead of performing her job-related field activities. Moreover, he repeated his importunings by telephone after obtaining Bundy's unlisted home number.

3. Carolyn Epps, who worked for the agency between 1967 and 1974, testified that after she asked her supervisor, Lawrence Swain, about the possibility of a promotion he began making unsolicited physical and verbal advances toward her, App. 93–96, and that she received verbal sexual advances from supervisor Claude Burgin after she discussed her promotion with

him. App. 94. Epps also testified that she heard Swain ask other female employees to come to his apartment for drinks and saw him pressing his body against their bodies in his office. App. 96–97. In 1974 Epps applied to become an administrative aide-stenographer, which would have meant a promotion from GS–6 to GS–7. She testified that, although she was qualified for the job, it went instead to another female employee who had received sexual advances from Swain and who, unlike Epps, did not know stenography. App. 100–101.

Ann Blanchard worked for the agency from 1971 to 1973, supervised by James Gainey and Arthur Burton. Burton made sexual advances toward her and also apparently intimidated her by stating that another employee whom he would not identify had told Burton that Blanchard had been conducting a sexual relationship with one of her agency clients. App. 105–106.

Bundy then informally consulted an Equal Employment Opportunity (EEO) Officer who was working in her office, and then requested a meeting with Claude Burgin, Swain's supervisor. On February 18, 1975 Bundy met with Burton and Burgin and told the latter that Burton and Gainey had sexually harassed her and denied her a promotion because she had resisted their advances. Burgin simply responded that she was denied the promotion because her work was unsatisfactory, and that she was free to pursue the matter further if she cared to. App. 46–48. Bundy then informally complained about the sexual harassment to Aquila Gilmore, the Chief EEO Officer in the agency. Gilmore, however, simply advised that her charges might be difficult to prove, and cautioned her against bringing unwarranted complaints. He never brought the issue to the attention of Delbert Jackson, by then Director of the agency. App. 187–190.

On April 11, 1975 Bundy met with Jackson and showed him the draft of a letter summarizing her complaint. Jackson then arranged an April 14 meeting with Burgin, Burton, and Bundy, Finding of Fact No. 39, App. 14, but Gilmore, who had become Chief of Manpower Management at the agency, and Charles Rogers, Assistant Director of Operations, also attended the meeting. Bundy, purportedly embarrassed at the unexpected presence of the latter two men, did not take the opportunity of discussing her sexual harassment claims at this meeting, nor did Jackson or Gilmore raise the issue. Instead, the meeting focused on Bundy's possible promotion and

her alleged work deficiencies. *Id.* No. 40, App. 15–16. On April 23 Gainey and Burton completed a memorandum offering Bundy's inadequate work performance as the reason for denying her a promotion to GS–9. Plaintiff's Exh. 2, Appellant's Supplemental Appendix (SA) 217. Bundy responded to this memorandum, arguing that her supervisors had never presented her with any written criticism of her performance until she raised the harassment issue. *See* App. 145–148.[4]

Bundy proceeded to pursue her complaint beyond her immediate supervisors. She registered an informal complaint with EEO Officer Philip Matthews, App. 64–65,[5] and then filed a formal complaint and supplemental complaints with the agency. Jackson, having learned of the formal complaints, took no steps to investigate them beyond simply asking Burton, Gainey, and Swain whether they had made improper advances to Bundy. Finding of Fact No. 44, App. 16–17; App. 125–127. Bundy was finally promoted to GS–9 in July 1976. Having received "satisfactory" ratings for her work performance, she became eligible for promotion to GS–11 in July 1977, but has not yet received that promotion.

Bundy filed her complaint in the District Court on August 3, 1977.[6]

## II. CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

The District Court appeared to find that even Bundy took a casual attitude toward the pattern of unsolicited sexual advances in the agency, Finding of Fact No. 47, App. 17, thereby implying that these advances by

---

4. The memorandum criticized Bundy for failing to file proper weekly and monthly reports, to serve clients properly, and to make sufficient field visits. Plaintiff's Exh. No. 2, SA 217. Bundy responded that all her co-workers normally had difficulties filing reports because of inefficiencies in the filing system, that it was not possible to give any better service to her excessive number of clients in the 15–30 minutes allotted for consultation with each one, and that her supervisors never provided her with any express requirements or goals for the number of her field visits. App. 61–64.

5. Even after Bundy consulted Matthews, Burton apparently continued to intimidate her, accusing her of failing to honor a duty assignment, App. 149–150, which Bundy testified she had never been given, Plaintiff's Exh. No. 9, SA 250.

6. Since the agency took no final action on her complaint, and since she waited more than 180 days after she filed the complaint with the agency, Bundy fully exhausted her administrative remedies before proceeding in District Court. 42 U.S.C. § 2000e–16(c) (1976); Civil Service Commission Regulations § 713.281, Federal Personnel Manual Supp. 990–1 (1978).

themselves did no harm to female employees. We find little or no basis in the record for the District Court's finding or implication, especially since Bundy's testimony that the sexual harassment she endured did her serious emotional harm, App. 40, was essentially unrefuted. In any event, the essential basis for the District Court's refusal to hold that the sexual harassment was in itself a violation of Title VII, Conclusion of Law No. 5, App. 18, was not this factual finding, but the District Court's construction of Title VII.

■ The key provision of Title VII states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex * *[.]

42 U.S.C. § 2000e–2(a)(1) (1976). The specific provision of Title VII applying to employment with the District of Columbia, as well as to a federal agency as in Barnes v. Costle, supra, states:

All personnel actions affecting employees * * * in those units of the Government of the District of Columbia having positions in the competitive service * * * shall be made free from any discrimination based on race, color, religion, sex, or national origin.

Id. § 2000e–16(a). Despite the difference in language between these two sections, we have held that Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers, Barnes v. Costle, supra, 561 F.2d at 988, and so we may construe the latter provision in terms of the former. We infer that the District Court in this case did the same, and that it refused Bundy declaratory and injunctive relief because it believed that sexual harassment not leading to loss or denial of tangible employment benefits for the harassed employee fell outside the scope of discrimination with respect to "terms, conditions, or privileges of employment."

Because Paulette Barnes had had her job terminated after she refused her supervisor's sexual importunings, we were not required in Barnes to construe the phrase "terms, conditions, or privileges of employment." Instead, our task of statutory construction in Barnes was to determine whether the disparate treatment Barnes suffered was "based on * * * sex." Id. at 989. We heard arguments there that whatever harm Barnes suffered was not sex discrimination, since Barnes' supervisor terminated her job because she had refused sexual advances, not because she was a woman. We rejected those arguments as disingenuous in the extreme. The supervisor in that case made demands of Barnes that he would not have made of male employees. Id. "But for her womanhood * * [Barnes'] participation in sexual activity would never have been solicited. To say, then, that she was victimized in her employment simply because she declined the invitation is to ignore the asserted fact that she was invited only because she was a woman subordinate to the inviter in the hierarchy of agency personnel." Id. at 990 (emphasis added; footnotes omitted).[7]

■ We thus made clear in Barnes that sex discrimination within the meaning of Title VII is not limited to disparate treatment founded solely or categorically on gender. Rather, discrimination is sex discrimination whenever sex is for no legitimate reason a substantial factor in the discrimination. Id. at 990 & n.50, citing Phil-

---

7. We also rejected the argument that sexual harassment could not be gender discrimination simply because a woman could also harass a man, or because any homosexual supervisor could harass an employee of the same gender. We noted that in each instance the question is one of but-for causation: would the complain-
ing employee have suffered the harassment had he or she been of a different gender? Barnes v. Costle, 561 F.2d 983, 990 n.55 (D.C. Cir. 1977). Only by a reductio ad absurdum could we imagine a case of harassment that is not sex discrimination—where a bisexual supervisor harasses men and women alike. Id.

lips v. Martin Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); see 29 C.F.R. § 1604.4(a) (1979) ("so long as sex is a factor in the application of [an employer's decision], such application involves a discrimination based on sex"). Other circuits have agreed. Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044 (3d Cir. 1977); Garber v. Saxon Business Products, Inc., 552 F.2d 1032 (4th Cir. 1977); see Miller v. Bank of America, 600 F.2d 211 (9th Cir. 1979).

We thus have no difficulty inferring that Bundy suffered discrimination on the basis of sex. Moreover, applying Barnes, we have no difficulty ascribing the harassment—the "standard operating procedure"—to Bundy's employer, the agency. Although Delbert Jackson himself appears not to have used his position as Director to harass Bundy, an employer is liable for discriminatory acts committed by supervisory personnel, Barnes v. Costle, supra, 561 F.2d at 993, and there is obviously no dispute that the men who harassed Bundy were her supervisors. Barnes did suggest that the employer might be relieved of liability if the supervisor committing the harassment did so in contravention of the employer's policy and without the employer's knowledge, and if the employer moved promptly and effectively to rectify the of-

fense. Id.; see Croker v. Boeing Co. (Vertol Div.), 437 F.Supp. 1138, 1194 (E.D. Pa. 1977). Here, however, Delbert Jackson and other officials in the agency who had some control over employment and promotion decisions had full notice of harassment committed by agency supervisors and did virtually nothing to stop or even investigate the practice.[8] See id. at 1191. And though there was ample evidence in this case that at least two other women in the agency suffered from this harassment, see note 3 supra, Barnes makes clear that the employer could be held liable even if Bundy were the only victim, since Congress intended Title VII to protect individuals against class-based prejudice. Barnes v. Costle, supra, 561 F.2d at 993.[9]

We thus readily conclude that Bundy's employer discriminated against her on the basis of sex. What remains is the novel question whether the sexual harassment of the sort Bundy suffered amounted by itself to sex discrimination with respect to the "terms, conditions, or privileges of employment." Though no court has as yet so held, we believe that an affirmative answer follows ineluctably from numerous cases finding Title VII violations where an employer created or condoned a substantially discriminatory work environment, regardless of whether the complaining employees lost

---

**8.** This case thus also satisifes the more stringent test of employer respondeat superior liability Judge MacKinnon advocated in his concurrence in Barnes v. Costle, supra note 7, 561 F.2d at 995–1001: The employer, in full knowledge of the alleged offense and having received a formal complaint, was in the best position to correct the offenses, yet impeded the complaint—and even abetted the offenses.

We note in this context that the District Court's finding that Jackson, among others, did not take the harassment ritual "seriously" is a remarkable non sequitur.

Jackson never took any further steps whatsoever to ascertain whether Bundy's complaints were valid, nor did he take plaintiff's complaint seriously enough to ask for a copy of the written report of the investigation which was conducted. This is a further indication that Jackson, as had others before him, considered sexual advances by males in the office to female employees as a game that was played and not to be taken seriously.

Finding of Fact No. 44, App. 16. To state the all too obvious, Jackson may have avoided all investigation precisely because he realized that proof of a practice of sexual harassment would be a serious matter for his agency indeed. Alternatively, if he in fact did consider the whole matter trivial, he was only compounding Bundy's difficulty in obtaining relief from harassment and thus, in a sense, compounding the Title VII violation.

**9.** We note that although a pattern or practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action. Cariddi v. Kansas City Chiefs Football Club, Inc., 568 F.2d 87, 88 (8th Cir. 1977); Fekete v. U. S. Steel Corp., 353 F.Supp. 1177, 1186 (W.D. Pa. 1973); see Int'l Brhd of Teamsters v. United States, 431 U.S. 324, 336 n.16, 97 S.Ct. 1843, 1854 n.16, 52 L.Ed.2d 396 (1977).

any tangible job benefits as a result of the discrimination.

Bundy's claim on this score is essentially that "conditions of employment" include the psychological and emotional work environment—that the sexually stereotyped insults and demeaning propositions to which she was indisputably subjected and which caused her anxiety and debilitation, App. 40, illegally poisoned that environment. This claim invokes the Title VII principle enunciated by Judge Goldberg in *Rogers v. Equal Employment Opportunity Com'n*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). The plaintiff in *Rogers*, a Hispanic, did not claim that her employer, a firm of opticians, had deprived her of any tangible job benefit. Rather, she claimed that by giving discriminatory service to its Hispanic *clients* the firm created a discriminatory and offensive work environment for its Hispanic *employees*. Granting that the express language of Title VII did not mention this situation, Judge Goldberg stated:

> Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso the parameter of such nefarious activities. Rather, it pursued the path of wisdom by being unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable practices of the present can easily become the injustices of the morrow. Time was when employment discrimination tended to be viewed as a series of isolated and distinguishable events, manifesting itself, for example, in an employer's practices of hiring, firing, and promoting. But today employment discrimination is a far more complex and pervasive phenomenon, as the nuances and subtleties of discriminatory employment practices are no longer confined to bread and butter issues. As wages and hours of employment take subordinate roles in management-labor relationships, the modern employee makes ever-increasing demands in the nature of intangible fringe benefits. Recognizing the importance of these benefits, we should neither ignore their need for protection, nor blind ourselves to their potential misuse.

454 F.2d at 238. The Fifth Circuit then concluded that the employer had indeed violated Title VII, Judge Goldberg explaining that "terms, conditions, or privileges of employment"

> is an expansive concept which sweeps within its protective ambit the practice of creating a work environment heavily charged with ethnic or racial discrimination. * * * One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers * * *.

*Id.; accord, Carroll v. Talman Federal Savings & Loan Ass'n*, 604 F.2d 1028, 1032–1033 & n.13 (7th Cir. 1979), *petition for cert. pending* (forcing female bank employees to wear uniforms while allowing males to wear own suits violates Title VII by perpetuating demeaning sexual stereotypes; "terms and conditions of employment" mean more than tangible compensation and benefits); *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir. 1977) (though employee could only prove isolated incidents, a pattern of offensive ethnic slurs would violate his Title VII rights); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514–515 (8th Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977) (segregated employee eating clubs condoned—though not organized or regulated—by employer violate Title VII by creating discriminatory work environment); *Gray v. Greyhound Lines, East*, 178 U.S.App.D.C. 91, 545 F.2d 169, 176 (D.C. Cir. 1976) (pattern of racial slurs violates Title VII rights to nondiscriminatory environment); *United States v. City of Buffalo*, 457 F.Supp. 612, 631–635 (W.D. N.Y. 1978) (black employees entitled to work environment free of racial abuse and insult); *Compston v. Borden, Inc.*, 424 F.Supp. 157 (S.D. Ohio 1976) (demeaning religious slurs by supervisor violate Title VII); *Steadman v. Hundley*, 421 F.Supp. 53, 57 (N.D. Ill. 1976) (racial slurs may lead to Title VII violation); *cf. Harrington v. Vandalia-Butler Board of Educ.*, 585 F.2d 192,

194 n.3 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979) (giving female physical education teachers inferior locker and shower facilities is illegal discrimination; Title VII reaches "actual working conditions," not just equal opportunity for employment); *Waters v. Heublein, Inc.*, 547 F.2d 466 (9th Cir.), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1977) (white plaintiff has standing to sue employer who discriminates against blacks, since she has statutory right to work environment free of racial prejudice); *Swint v. Pullman-Standard*, 539 F.2d 77 (5th Cir. 1976) (discriminatory job assignments violate Title VII even where no discrimination in salary; Title VII claimant need not prove tangible economic harm).[10]

The relevance of these "discriminatory environment" cases to sexual harassment is beyond serious dispute. Racial or ethnic discrimination against a company's minority clients may reflect no intent to discriminate directly against the company's minority employees, but in poisoning the atmosphere of employment it violates Title VII. Sexual stereotyping through discriminatory dress requirements may be benign in intent, and may offend women only in a general, atmospheric manner, yet it violates Title VII. Racial slurs, though intentional and directed at individuals, may still be just verbal insults, yet they too may create Title VII liability. How then can sexual harassment, which injects the most demeaning sexual stereotypes into the general work environment and which always represents an intentional assault on an individual's innermost privacy, not be illegal?

Moreover, an important principle articulated in *Rogers v. Equal Employment Opportunity Com'n, supra*, suggests the special importance of allowing women to sue to prevent sexual harassment without having to prove that they resisted the harassment and that their resistance caused them to lose tangible job benefits. Judge Goldberg noted that even indirect discrimination is illegal because it

> may constitute a subtle scheme designed to create a working environment imbued with discrimination and directed ultimately at minority group employees. As patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees.
> * * *

454 F.2d at 239. Thus, unless we extend the *Barnes* holding, an employer could sexually harass a female employee with impunity by carefully stopping short of firing the employee or taking any other tangible actions against her in response to her resistance, thereby creating the impression—the one received by the District Court in this case—that the employer did not take the ritual of harassment and resistance "seriously."

Indeed, so long as women remain inferiors in the employment hierarchy, they may have little recourse against harassment beyond the legal recourse Bundy seeks in this case. The law may allow a woman to prove that her resistance to the harassment cost her her job or some economic benefit, but this will do her no good if the employer never takes such tangible actions against her.

> And this, in turn, means that so long as the sexual situation is constructed with enough coerciveness, subtlety, suddenness, or one-sidedness to negate the effectiveness of the woman's refusal, or so long as her refusals are simply ignored while her job is formally undisturbed, she is not considered to have been sexually harassed.

---

10. The Equal Employment Opportunity Commission (EEOC) itself, to whose interpretation of Title VII we owe considerable deference, *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971), has consistently held that the statute grants an employee a working environment free of discrimination. *E.g.,* EEOC Decision No. 74-84, CCH EEOC Decisions ⸲ 6450 (1975); EEOC Decision No. 72-0779, CCH EEOC Decisions ⸲ 6321, 4 FEP Cases 317 (1971).

C. MacKinnon, Sexual Harassment of Working Women 46–47 (1979). It may even be pointless to require the employee to prove that she "resisted" the harassment at all. So long as the employer never literally forces sexual relations on the employee, "resistance" may be a meaningless alternative for her. If the employer demands no response to his verbal or physical gestures other than good-natured tolerance, the woman has no means of communicating her rejection. She neither accepts nor rejects the advances; she simply endures them. She might be able to contrive proof of rejection by objecting to the employer's advances in some very visible and dramatic way, but she would do so only at the risk of making her life on the job even more miserable. *Id.* at 43–47. It hardly helps that the remote prospect of legal relief under *Barnes* remains available if she objects so powerfully that she provokes the employer into firing her.

The employer can thus implicitly and effectively make the employee's endurance of sexual intimidation a "condition" of her employment. The woman then faces a "cruel trilemma." She can endure the harassment. She can attempt to oppose it, with little hope of success, either legal or practical, but with every prospect of making the job even less tolerable for her. Or she can leave her job, with little hope of legal relief [11] and the likely prospect of another job where she will face harassment anew.

 Bundy proved that she was the victim of a practice of sexual harassment and a discriminatory work environment permitted by her employer. Her rights under Title VII were therefore violated. We thus reverse the District Court's holding on this issue and remand it to that court so it can fashion appropriate injunctive relief.[12] And on this novel issue, we think it advisable to offer the District Court guidance in framing its decree.[13]

**11.** *Compare In re Carmita Wood*, Case No. 75–92437, New York State Dep't of Labor Unemployment Insurance Appeals Board, Decision and Notice of Decision (March 7, 1975) (employee who claimed sexual harassment forced her to leave job was held to have resigned voluntarily and thus was ineligible for compensation), *with* Appeals Board Decision No. P–B–139 (California), *reversing* Decision of the Referee, *In re Nancy J. Fillhouer*, Case No. SJ–5963, William J. Costello, Referee (San Jose Referee Office, April 28, 1975) (granting such claim).

**12.** Title VII allows the courts to award a victorious plaintiff reinstatement, back pay, or "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g) (1976). Back pay and reinstatement are, of course, irrelevant to the discriminatory environment issue, and we follow the great majority of the federal courts in construing "equitable relief" to preclude any award of damages for emotional harm resulting from a Title VII violation. *E.g., Harrington v. Vandalia-Butler Board of Educ.,* 585 F.2d 192 (6th Cir. 1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); *Curran v. Portland Superintending School Committee,* 435 F.Supp. 1063, 1077–1078 (D. Me. 1977), *Wright v. St. John's Hospital,* 414 F.Supp. 1202, 1205 (D. Okl. 1976); *see Equal Employment Opportunity Com'n v. Detroit Edison Co.,* 515 F.2d 301, 308–309 (6th Cir. 1975), *vacated and remanded,* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1976). We add that, since our holding makes Bundy a prevailing party in this suit, the District Court on remand may entertain a request for attorney's fees. 42 U.S.C. § 2000e–5(k) (1976).

**13.** Appellee has argued that an injunction is improper and unnecessary in this case since Bundy has complained of no instances of sexual harassment since 1975 and there is therefore no reason to think further harassment will occur. Common sense tells us that the men who harassed Bundy may well have ceased their actions solely because of the pendency of her complaint and lawsuit. Moreover, the law tells us that a suit for injunctive relief does not become moot simply because the offending party has ceased the offending conduct, since the offending party might be free otherwise to renew that conduct once the court denied the relief. *Allee v. Medrano,* 416 U.S. 802, 810–811, 94 S.Ct. 2191, 2197–2198, 40 L.Ed.2d 566 (1974). The request for injunctive relief will be moot only where there is no reasonable expectation that the conduct will recur, *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed.2d 1303 (1953), or where interim events have "completely and irrevocably eradicated the effects of the alleged violation," *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). We perceive no such certainty here, most obviously because Bundy's agency has taken no affirmative steps to prevent recurrence of the harassment, and because all the harassing employees still work for the agency. The issuance of Mayor's Order No. 79–89 (May 24, 1979), *see*

The Final Guidelines on Sexual Harassment in the Workplace (*Guidelines*) issued by the Equal Employment Opportunity Commission on November 10, 1980, 45 Fed. Reg. 74676–74677 (1980) (to be codified at 29 C.F.R. § 1604.11(a)–(f)), offer a useful basis for injunctive relief in this case. Those Guidelines define sexual harassment broadly:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

*Guidelines, supra*, 45 Fed.Reg. at 74677 (to be codified at 29 C.F.R. § 1604.11(a)). The Guidelines go on to reaffirm that an employer is responsible for discriminatory acts of its agents and supervisory employees with respect to sexual harassment just as with other forms of discrimination, regardless of whether the employer authorized or knew or even should have known of the acts, *id.* (to be codified at 29 C.F.R. § 1604.-11(d)), and also remains responsible for sexual harassment committed by nonsupervisory employees if the employer authorized, knew of, or should have known of such harassment, *id.* (to be codified at 29 C.F.R. § 1604.11(d)). The general goal of these Guidelines is *preventive*. An employer may negate liability by taking "immediate and appropriate corrective action" when it learns of any illegal harassment, *id.*, but the employer should fashion rules within its firm or agency to ensure that such corrective action never becomes necessary, *id.* (to be codified at 29 C.F.R. § 1604.11(f)).

Applying these Guidelines to the present case, we believe that the Director of the agency should be ordered to raise affirmatively the subject of sexual harassment with all his employees and inform all employees that sexual harassment violates Title VII of the Civil Rights Act of 1964, the Guidelines of the EEOC, the express orders of the Mayor of the District of Columbia,[14] and the policy of the agency itself. The Director should also establish and publicize a scheme whereby harassed employees may complain to the Director immediately and confidentially. The Director should promptly take all necessary steps to investigate and correct any harassment, including warnings and appropriate discipline directed at the offending party, and should generally develop other means of preventing harassment within the agency.

Perhaps the most important part of the preventive remedy will be a prompt and effective procedure for hearing, adjudicating, and remedying complaints of sexual harassment within the agency. Fortunately, the District Court need not establish an entire new procedural mechanism for harassment complaints. Under regulations promulgated by the Equal Employment Opportunity Commission, 29 C.F.R. §§ 1613.201–1613.283 (1979), the Department of Corrections, like all other federal and District of Columbia agencies, is required to establish procedures for adjudication of complaints of denial of equal employment op-

text and note at note 14 *infra*, does not provide any certainty that the offending conduct will not recur.

14. On October 31, 1975 the Mayor of the District of Columbia issued Mayor's Order No. 75–230, prohibiting employment discrimination on the basis of sex and other improper factors in all District agencies. On May 24, 1979 Mayor Barry amended Order No. 75–230 with Mayor's Order No. 79–89, which construes illegal sexual discrimination to include sexual harass-

ment, requires the District's Office of Human Rights to receive and adjudicate any complaints of sexual harassment of District employees according to the procedures set forth in Mayor's Order No. 75–230, and requires all agency heads to establish and implement intraagency means of investigating and adjudicating complaints of harassment. These orders are a useful supplement to the EEOC Guidelines and a District Court injunction.

portunity, whether the ground of discrimination is race, color, religion, sex, or national origin. The required procedures guarantee the complainant a prompt and effective investigation, an opportunity for informal adjustment of the discrimination, and, if necessary, a formal evidentiary hearing. Moreover, if the complaint proves meritorious the agency may be required to take disciplinary action against any employee found to have committed discriminatory acts. *Id.* § 1613.221(c). Finally, the agency must inform any employee denied relief within the agency of his or her right to file a civil action in the District Court. *Id.* § 1613.282.

Since we have held that sexual harassment, even if it does not result in loss of tangible job benefits, is illegal sex discrimination, the District Court may simply order the Director of the agency to ensure that complaints of sexual harassment receive thorough and effective treatment within the formal process the agency has already established to comply with the Civil Service Commission regulations. Finally, we believe the District Court should retain juris-

diction of the case so that it may review the Director's plans for complying with the injunction.[15]

### III. CLAIMS FOR BACK PAY AND PROMOTION

Beyond claiming that the sexual harassment she suffered was illegal in itself, Bundy claims that her supervisors illegally retaliated against her refusal of their sexual propositions by delaying her promotion to GS–9 level, and that they continue to retaliate by denying her a promotion to GS–11. Bundy thus requests back pay for the delay in promotion to both levels, and an order requiring her immediate promotion to GS–11. The District Court held against Bundy on these claims, essentially finding that the supervisors were not offended by Bundy's refusal of their advances, and hence had no motive to retaliate against her, and that Bundy's flawed qualifications and work performance gave them legitimate reasons for delaying and denying the promotions. Bundy now argues that the District Court's factual findings were clearly erroneous, Fed.R.Civ.P. 52(a), and notes that in a dis-

---

**15.** We offer the following as appropriate language for the injunction:

The court decrees that the defendant Delbert Jackson, Director of the District of Columbia Department of Corrections, along with his supervising employees, agents, and all those subject to his control or acting in concert with him, are enjoined from causing, encouraging, condoning, or permitting the practice of sexual harassment of female employees by male supervisors and employees within the Department: to wit, any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when submission to such conduct is explicitly or implicitly a requirement of the individual's employment, or used as a basis for any employment decision concerning that individual, or when such conduct has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating or hostile or offensive work environment.

Defendant is further required:

1. To notify all employees and supervisors in the Department, through individual letters and permanent posting in prominent locations throughout Department offices, that sexual harassment, as explicitly defined in the previous paragraph, violates Title VII of the Civil Rights Act of 1964, regulatory

guidelines of the Equal Employment Opportunity Commission, the express orders of the Mayor of the District of Columbia, and the policy of the Department of Corrections.

2. To ensure that employees complaining of sexual harassment can avail themselves of the full and effective use of the complaint, hearing, adjudication, and appeals procedures for complaints of discrimination established by the Department of Corrections pursuant to Equal Employment Opportunity Commission regulations, 29 C.F.R. §§ 1613.-201–1613.283 (1979).

3. To develop appropriate sanctions or disciplinary measures for supervisors or other employees who are found to have sexually harassed female employees, including warnings to the offending person and notations in that person's employment record for reference in the event future complaints are directed against that person.

4. To develop other appropriate means of instructing employees of the Department of the harmful nature of sexual harassment.

Defendant shall return to this court within 60 days to report on the steps he has taken in compliance with this order and to present his plans for the additional measures required by Paragraph 4 above. The court shall retain jurisdiction of this case.

crimination case the appellate court may make an independent review of the record to determine whether the District Court was correct in finding the "ultimate fact" of ·discrimination or no discrimination. *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 836 (D.C. Cir. 1977). The parties presented to the District Court, and present to us now, a fairly confusing set of facts with respect to the promotion claims. We review them only very briefly.

Bundy became eligible for promotion to GS–9 in January 1975 after 12 months as a GS–7. She was not promoted until July 1976.[16] At the time she became technically eligible for a promotion she was told that a temporary job freeze made even a recommendation of promotion impossible. Nevertheless, other employees in her unit were recommended for promotion and even promoted during the purported freeze. App. 41–44. Specifically, William Hill, another Vocational Rehabilitation Specialist, was promoted to GS–9 in May 1975 after 15 months as a GS–7 and three months of technical eligibility, App. 184, and William Goff, who was hired as a GS–9 Vocational Rehabilitation Specialist, was promoted to GS–11 in July 1975 after 15 months as a GS–9, App. 183. Bundy cites evidence that she performed the same work as these men, and that she performed it every bit as well as they did. App. 107–108.

The trial court found that Bundy's work was in fact deficient, and that her qualifications were inferior to those of Hill and Goff. It found that Bundy had taken excessive sick leave, failed to file required reports, made insufficient field contacts, and neglected to report her duty assignments, Findings of Fact Nos. 16–19, App. 10, and that her supervisors had properly informed her of these deficiencies, *id.* No. 20, App. 10. It also found that Hill and Goff, unlike Bundy, had had considerable experience working with ex-offenders or disadvantaged youths before they joined the agency, and that Goff, unlike Bundy, possessed a college degree. The District of Columbia now supports the .District Court decision by noting that Bundy's consistent "satisfactory" work ratings are not in themselves a sufficient basis for promotion, Defendant's Exh. No. 17, SA 294, and that had Bundy been promoted in January 1975 she would have achieved the promotion faster than any employee in her unit, male or female, and *much* earlier than several male employees, Defendant's Exh. No. 14, SA 288. Bundy responds that there is no basis for the District's challenges to her work performance, that—in the testimony ,of her colleague Ann Blanchard—all employees in the unit had difficulty with filing and other procedures, App. 107–114, and that her allegedly excessive sick leave was in fact due to emotional stress she suffered as a result of sexual harassment, App. 39–40.

As for her desired promotion to GS–11, Bundy notes that such a promotion was granted in 1977 to another employee, Curtis Davis, whose responsibilities and performance, she argues, were similar to hers. In finding against her on this issue, the District Court found that because Bundy, unlike Davis, worked mostly with so-called "regular procedure" cases rather than "special procedure" cases, as defined by the Civil Service Commission, she was not eligible for GS–11. Findings of Fact Nos. 10–11, App. 9; Conclusion of Law No. 4; App. 17.

The relevant distinction between Bundy's and Davis' work is apparently that Bundy worked primarily with clients over 26 years old and Davis solely with clients under 26. App. 73–75. Bundy insists that the District Court misconstrued the Civil Service classifications in concluding that the age of the

---

**16.** Bundy thus believes she is entitled to back pay for the period between January 1975 and July 1976. However, as we noted earlier, *see* note 1 *supra*, the District has conceded that Bundy should have been promoted at least as of February 1976, since the agency improperly denied her January 1976 promotion request in wrongful response to her filing of a discrimination claim. Thus the request for back pay to compensate for the delay in promotion to GS–9 allegedly due to her refusal of her supervisors' sexual advances really involves the 12-month period from January 1975 to January 1976.

clients automatically and by itself determines a Vocational Rehabilitation Specialist's eligibility for GS-11. She argues that the Civil Service Commission's notion of "special procedure" cases is in fact flexible, including clients of any age who present such special placement problems as illiteracy or emotional disability. Since many of her adult clients have such problems, App. 192–193, 207–208, she believes the District Court erred in categorically presuming that she was ineligible for GS-11.[17] Although this issue may appear to be one of construing the Civil Service classification rules, it is also a factual question of the similarity or difference between Bundy's and Davis' responsibilities.

■■■ In a case of such factual dispute, we of course owe great deference to the trial court's findings. Indeed, we must affirm the trial court's conclusion on the question of discrimination if the so-called "subsidiary facts" are not clearly erroneous, if the inferences drawn from them are reasonable, and if the findings and inferences reasonably support the "ultimate" factual finding on discrimination. *Kinsey v. First Regional Securities, Inc., supra*, 557 F.2d at 835–836. Nevertheless, were we to make a final disposition of Bundy's back pay and promotion claims, even under this highly deferential standard we might be inclined to overrule the District Court. Most important, we would readily reject as clearly erroneous the District Court's findings that the supervisors in Bundy's agency never took the ritual of harassment seriously and that they therefore had no motive for retaliating against Bundy. Findings of Fact Nos. 38, 44, App. 15, 16. Moreover, we would at least be inclined to question the District Court's findings on Bundy's allegedly poor work performance, *id.* Nos. 16–20, App. 10, since the only important evidence of flaws in her work was the self-serving testimony of supervisors who had themselves been her harassers.

■■■ However, we cannot make a final disposition of these claims, because the District Court, whether right or wrong in its factual findings, failed to allocate properly the burden of proof according to Title VII principles. The District Court's findings of fact and conclusions of law in no way indicate that the court properly defined the requirements of the plaintiff's prima facie case, or the burden the employer bears in rebutting a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 805, 93 S.Ct. 1817, 1824, 1825, 36 L.Ed.2d 668 (1973); *Hackley v. Roudebush*, 520 F.2d 108, 157–158 (D.C. Cir. 1975). We therefore must remand the case to the District Court to enable it to conduct further evidentiary proceedings in accordance with the proper allocation of burden of proof. However, adjusting the general burden of proof principles of *McDonnell Douglas Corp. v. Green*, *supra*, to unusual factual situations is a matter of some difficulty, and this sexual harassment claim is indeed exceptionally unusual among Title VII cases. We therefore shall attempt to guide the District Court in this matter.

■■■ Recognizing the difficulty a plaintiff faces in proving the motives behind an employer's actions, *McDonnell* established the general principle that in an employment discrimination case under Title VII the employee must first make out a prima facie case.

> This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. * * *

---

**17.** As we noted earlier, *see* note 6 *supra*, Bundy properly exhausted her administrative remedies on her harassment claims. We reject the District's argument that Bundy cannot request an order of promotion to GS–11 in this discrimination suit because she did not previously request reclassification with the Civil Service Commission, since her classification argument is an incident of her harassment claims.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). As the Supreme Court noted in a later case, this prima facie showing does not in itself prove illegal discrimination. Rather, it constitutes proof of actions taken by the employer from which we can reasonably infer a discriminatory animus, because common experience tells us that such actions normally have a discriminatory motive. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–580, 98 S.Ct. 2943, 2950–2952, 57 L.Ed.2d 957 (1978). Once the prima facie case is made out, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for denying the applicant the position. *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 804, 93 S.Ct. at 1825. If the employer meets that burden, he has rebutted the prima facie case. But the employee must still have a "full and fair opportunity" to prove in response that the purported legitimate reason was in fact a mere pretext for discrimination. *Id.* at 805, 93 S.Ct. at 1825. Normally, the plaintiff must make out his prima facie case by a preponderance of the evidence. The employer's burden to articulate a legitimate, nondiscriminatory reason for his action is simply the burden of going forward with the evidence. *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (*per curiam*); *id.* at 29, 99 S.Ct. at 297 (Stevens, J., dissenting). Once the employer has submitted evidence tending to show that he had a legitimate reason for his action, the burden of going forward with the evidence shifts back to the plaintiff. Under *McDonnell*, the ultimate burden of persuasion always remains with the plaintiff.

The literal *McDonnell* formula, of course, is designed for a claim of discriminatory refusal to hire due to alleged racial prejudice. It does not precisely apply to a claim, like Bundy's, of discriminatory refusal *to promote*. Even more important, the *McDonnell* formula presumes the standard situation where the alleged discrimination is due to the bare fact of the claimant's membership in a disadvantaged group. It therefore also fails to fit with precision the very unusual, perhaps unique, situation of sexual harassment, where the alleged basis of discrimination is not the employee's gender *per se*, but her refusal to submit to sexual advances which she suffered in large part because of her gender. *McDonnell* itself, however, recognizes very realistically that the courts must adjust the definition of a prima facie case and the allocation of burden of proof to the differing situations that may arise in Title VII cases, 411 U.S. at 802 n.14, 93 S.Ct. at 1824 n.14, and with that recognition in mind we proceed to consider the proper proof standards for this case.

Adjusting the *McDonnell* formula to cases of discriminatory refusal to promote is relatively simple. Thus to make out a prima facie case the plaintiff must show that she belongs to a protected group, that she was qualified for and applied for a promotion, that she was considered for and denied the promotion, and that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied. *Kunda v. Muhlenberg College*, 463 F.Supp. 294, 307 (E.D.Pa. 1978). Qualification for promotion, of course, may not be a strictly precise concept, and will depend on the rules and customs of a particular employer. In the present case, for example, a Vocational Rehabilitation Specialist's technical eligibility for promotion to a GS–9 level never automatically means promotion, nor does mere "satisfactory" performance in the complainant's current job ever guarantee promotion. But proof of these factors certainly helps establish a prima facie case. On the other hand, there can be no absolute precise and uniform time period before and after the denial of the complainant's promotion during which plaintiffs must show that similarly qualified nondisadvantaged employees were promoted. But a court can certainly determine a reasonable period on the facts of a particular case.

This minor adjustment in the *McDonnell* formula for promotion cases could, of course, end our analysis of the issue of Bundy's claims for back pay and

promotion; since she is obviously a member of a protected group—women—Bundy could go on to prove the other requisite factors. *See Williams v. Bell,* 587 F.2d 1240, 1245–1246 n.45 (D.C. Cir. 1978) (dictum). Nevertheless, to treat Bundy's case as if it were equivalent to an ordinary case of alleged gender discrimination is manifestly unfair. Unlike a woman claiming general gender discrimination, Bundy has already proved that she is a victim of illegal discrimination as a matter wholly independent of her claim for back pay and promotion. We think she should therefore enter the ritual of order of proof at an advantage over the typical Title VII plaintiff who claims categorical gender discrimination which can only be proved as an incident of the discriminatory denial of promotion or other tangible benefit.

We have already essentially taken this view in an analogous case. In *Day v. Mathews,* 530 F.2d 1083 (D.C. Cir. 1976), a black employee of the Department of Health, Education and Welfare had sought promotion. He alleged, and HEW conceded, that HEW officials had discriminated against him on account of his race by impeding his request through administrative delays and unfairly low ratings of his performance. *Id.* at 1084. Nevertheless, HEW argued that Day would not have gotten the promotion even if he had not been the victim of discrimination; apparently HEW believed the discrimination was a gratuitous act by prejudiced officials and that Day was in any event not qualified for the promotion. In remanding the case to the District Court for further evidentiary

proceedings under the proper legal standard of proof, we held that, since the employer had already been proved a discriminator, the plaintiff's prima facie case with respect to the denial of promotion had in effect already been made out, and that the burden should immediately shift to the employer to prove that Day's qualifications were such that he would not have been promoted even if he had not been the victim of discrimination. *Id.* at 1085. Moreover, in this special circumstance we held that the burden of persuasion, not just the burden of going forward with the evidence, shifted to the employer. And we held that the employer must meet his burden by clear and convincing evidence, rather than simply by a preponderance of the evidence. *Id. See Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 444–445 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974) (once employer is proved to have discriminated against plaintiff class, he bears burden of presenting clear and convincing evidence on issue of discrimination against individual plaintiffs). We stressed in *Day* that since the employer's own proved discriminatory actions were largely responsible for the plaintiff's typical dilemma of having to prove the motive underlying the employer's past action, "any resulting uncertainty [should] be resolved against the party whose action gave rise to the problem." 530 F.2d at 1086 (footnote omitted). We thereby recognized that where a Title VII defendant is proved a discriminator as a matter independent of the plaintiff's claim of discriminatory denial of a tangible job benefit, the court should ease the plaintiff's burden on that latter claim.[18]

---

**18.** In *Pettit v. United States,* 203 Ct.Cl. 207, 488 F.2d 1026 (Ct.Cl. 1973), the Court of Claims addressed a claim analogous to Bundy's. The plaintiff, seeking relief from an allegedly discriminatory denial of a promotion, proved as an independent matter that supervisors in his agency had subjected him to a blatantly discriminatory work environment by making offensive racial jokes and insults and giving him inferior work facilities. *Id.* 203 Ct.Cl. 207, 488 F.2d at 1028. In assessing his claim for back pay and promotion the court accordingly and appropriately modified the *McDonnell* formula as follows:

We, therefore, hold that a prima facie case of failure to promote because of racial discrimination is made by showing: (i) that plaintiff belongs to a racial minority, (ii) that he was qualified for promotion and might have reasonably expected selection for promotion under the defendant's on-going competitive promotion system, (iii) that he was not promoted, and (iv) the supervisory level employees having responsibility to exercise judgment under the promotion system betrayed in other matters a predisposition towards discrimination against members of the involved minority. * * *

We would adjust the *McDonnell* formula to Bundy's claim as follows: To establish a prima facie case of illegal denial of promotion in retaliation against the plaintiff's refusal of sexual advances by her supervisors, the plaintiff must show (1) that she was a victim of a pattern or practice of sexual harassment attributable to her employer (Bundy has, of course, already shown this); and (2) that she applied for and was denied a promotion for which she was technically eligible and of which she had a reasonable expectation. If the prima facie case is made out, the employer then must bear the burden of showing, by clear and convincing evidence, that he had legitimate nondiscriminatory reasons for denying the claimant the promotion. As in *McDonnell*, if the employer successfully rebuts the prima facie case, the claimant should still have the opportunity to prove that the employer's purported reasons were mere pretexts.

The most important difference between this formula and the *McDonnell* formula is that we are not requiring the plaintiff to show as part of her prima facie case that other employees who were no better qualified, but who were not similarly disadvantaged, were promoted at the time she was denied a promotion. We relieve the plaintiff of the need to prove such facts because, as we have explained, we think her burden should be eased where she can prove not only that she is a member of a disadvantaged group, but also that she has personally suffered illegal discrimination through the harassment itself. We simply require the plaintiff to show that according to the employer's formal rules she was eligible for promotion and that, within the context of the employer's actual practical pattern of promotion, she had a reasonable expectation of the promotion she sought. In rebutting the prima facie case—if the plaintiff makes it out—the employer would then have to show by clear and convincing evidence that, despite the employee's technical eligibility for promotion, in practice it set qualification criteria for promotion more stringent than the employee could meet. The employer could support his rebuttal case by showing that any other employees who were promoted at approximately the time the plaintiff was denied promotion and who were not themselves victims of the pattern of sexual harassment in fact met these more stringent criteria. *See* note 18 *supra.*

Applying these principles, we remand the case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

---

*Id.* 203 Ct.Cl. 207, 488 F.2d at 1033; *accord, Detroit Police Officers Ass'n v. Young,* 446 F.Supp. 979, 1003 (E.D.Mich. 1978). The last element in this formula is the innovation most relevant to Bundy's case: the plaintiff can make out the prima facie case in part by showing discrimination independent of the back pay claim but obviously relevant to the question of the employer's motive in denying the plaintiff promotion. But we also note the important omission in this formula. Unlike the *McDonnell* formula, this one does not require the plaintiff to draw the relevant comparison between himself and other employees who were in fact promoted—or even to prove that other employees were promoted at the time his own request for promotion was denied. We infer that in *Pettit* the court intended that if any other employees were promoted at roughly the time the plaintiff sought promotion and if these employees were distinctly better qualified, the employer would have to prove these facts as part of his rebuttal. This issue arises in text *infra* when we instruct the District Court in the present case on the possible elements of the agency's rebuttal.