Beverly ROSS, Sheila Stoudenmire

v.

**DOUBLE DIAMOND, INC.,**
**Larry Womack.**

**Civ. A. No. 4–84–39–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

April 1, 1987.

---

Cantey, Hanger, Gooch, Munn & Collins, Edward L. Kemble, Rory Divin, Fort Worth, Tex., for plaintiffs.

Bird & Reneker, D. Ronald Reneker, Luke Madole, Dallas, Tex., for Double Diamond.

Law, Snakard & Gambill, Alan Wilson, Fort Worth, Tex., for Womack.

## MEMORANDUM OPINION

MAHON, District Judge.

Plaintiffs are sisters, both of whom were employed by the defendant, Double Diamond, Inc., prior to filing the charge of discrimination which is the basis of this suit. Plaintiffs allege that the defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by creating a sexually harassing work environment, by discharging plaintiffs because they reported sex harassment ("retaliatory discharge"), and by discharging plaintiffs because of their sex. Plaintiffs further allege that defendants violated Texas state law by violating plaintiff's right to privacy and by commiting battery toward Plaintiff Ross. By order of March 14, 1986, this Court bifurcated the state law claims from the claims under Title VII. Plaintiffs seek injunctive relief, back pay and costs under their Title VII claims and compensatory and punitive damages under their state law claims. The Title VII claims were tried before the Court in one proceeding from March 26, 1986 to April 10, 1986. The Court decided, *sua sponte,* to withhold issuing an opinion until after the United States Supreme Court's decision in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). On June 19, 1986, the Supreme Court announced its opinion in *Vinson. See* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Now, in light of the Supreme Court decision and having carefully considered the evidence, the Court enters the following findings and conclusions.

### Findings of Fact

Plaintiffs Beverly Ross and Sheila Stoudenmire are sisters, both of whom reside in Hood County, Texas. Defendant Double Diamond, Inc., is a Texas corporation with its principal place of business in Dallas County, Texas. Double Diamond is in the business of developing lakeside communities and selling property within such communities. Defendant Larry Womack is an individual who resides in Dallas County, Texas and is the Manager of Double Diamond's Canyon Creek facility. All of the events giving rise to this action occurred between August 5 and August 12, 1983 at Double Diamond's Canyon Creek development in Hood County, Texas. At that time, Ross was 20 years old and Stoudenmire was 23 years old.

On Friday, August 5, 1983, in response to an advertisement in the local newspaper, Stoudenmire interviewed with and was hired by Womack to be a salesperson at Canyon Creek. She was told to report for her first day of training on Monday, August 8, 1983. During the interview, Womack told Stoudenmire that he also was looking for a part-time receptionist/secretary. Stoudenmire recommended her sister, Ross, for the job.

On Saturday, August 6, 1983, Ross interviewed with and was hired by Womack for the job. She was to work from 9:00 a.m. to 5:00 p.m., Friday through Monday. Ross began work the following day, August 7, 1983.

On Sunday, August 7, 1983, Ross reported to work at 9:00 a.m. During the *first* hour that she was on the job, Womack asked Ross if she "fooled around" to which she answered no. A short time later, Womack asked Ross to bring him a cup of coffee. After Ross entered his office with the coffee, Womack told her that he wanted to take her picture. Ross stated that she did not want to have her picture taken. Womack ignored Ross's response and told Ross to stand against the wall so that he could take her picture. Ross agreed to do this because she was scared about what Womack's reaction would be if she refused his request. After Ross was against the wall, Womack then told Ross to pull up her dress. Continuing to be scared of Womack's possible reaction if she did not comply, Ross lifted her dress up two inches to her knees. Womack then took the picture, and Ross left the office. A short time later, Ross went back into Womack's office and asked for the picture. Womack refused to give the picture to her. Later that same day, Womack called Ross on the tele-

phone and asked her to pant heavily for him. Ross immediately hung up the phone.

During that evening, as was customary on most Sundays, Womack and several salesmen had a meeting in Womack's office. Ross entered Womack's office during the meeting to give a message to one of the salesmen. After she entered the office, a salesman, Larry West, placed a polaroid camera on the floor directly under Ross and took a picture up Ross' dress. The salesmen laughed at the event. Ross, finding no humor in the photograph, attempted to take the camera. Womack prevented Ross from getting the camera and took the picture out of the camera. At this point, the telephone rang and Ross left the room to answer it. A short time later, Ross approached Womack and asked for the picture. Womack declined to give Ross the picture and, instead, chose to lie by stating that the picture did not turn out. Womack further stated that he had thrown the picture out, and that Ross could not look for the picture in the waste paper basket. Later on, Womack called Ross on the phone and again asked her to pant heavily on the phone. Ross immediately hung up.

Ross finally left work at 9:30 p.m. When she arrived home, Ross called her sister, Stoudenmire, and told her about the barrage of hostile treatment to which she was subjected on her first day at work. Her sister encouraged her to continue at the job and told her that things would improve in the future. After this conversation Ross decided to go to work the following day.

Ross reported to work at 8:30 a.m. on Monday, August 8, 1983. Shortly thereafter, Womack called Ross into his office to bring him some coffee. As she entered the office, Womack told her to come over to him by the desk. She did so, and Womack physically pulled her onto his lap. A salesman, Robert Chapman, entered the office and saw Ross on Womack's lap. Chapman testified that Womack had his arms around Ross' waist and that Ross was feverishly trying to pull away. Chapman specifically stated that he thought Womack looked perverted. It was only after Chapman entered

the office that Womack released his hold on Ross.

Monday, August 8, 1983, was Sheila Stoudenmire's first day of work at Double Diamond as a sales trainee. At approximately 3:00 p.m. Sheila heard some of the salesmen laughing while looking at a picture which was in Womack's office. She informed her sister, Ross, of this, and they both went to Womack's office to obtain the picture. When they entered the office, two of the salesmen were at the desk looking at something. One of the salesmen slipped a picture into Womack's desk drawer, and they left the office. Sheila took the picture out of the drawer. The picture was the one West took up Ross' dress on the previous evening. She showed the picture to Ross, whereupon Ross began to cry and went to the ladies' room. (Plaintiff's Exhibit 6). Later that day, Womack called Ross into his office. Womack told Ross to "bend over" and clean up some mustard which was on the office wall. Ross refused to do so and started to leave the office. Womack proceeded to close the door to prevent Ross from leaving the room and trapped Ross up against the door. Ross escaped from his grasp by crawling out from under his arms. At this point Ross said she would clean up the mustard. She did so and then left.

Also, in the afternoon of Monday, August 8, 1983, Womack entered the room in which Stoudenmire was studying to speak with her. In the course of the conversation, Womack said to Stoudenmire that he bet she liked to wear black boots and carry a whip in the bedroom.

On Tuesday, August 9, 1983, Stoudenmire went to work and studied sales presentations as she was supposed to under her training program. Ross did not work on this day as she was hired to work only on Fridays, Saturdays, Sundays and Mondays. After work on Tuesday, Stoudenmire, Ross, and Tina Karasek, a recently hired salesperson, went to the Sheriff's Office to complain about Womack's offensive actions. The Sheriff informed the ladies that there was nothing that he could do for them. However, the Sheriff suggested

that the ladies bring the matter to the attention of Womack's boss and the District Attorney. If the ladies were not pleased with the response they received from these parties, the Sheriff suggested that they contact the Equal Employment Opportunity Commission (EEOC) or the District Attorney.

During the morning of Wednesday, August 10, 1983, Stoudenmire and Karasek approached Womack's supervisor, Robert Gray, and asked to speak privately with him. Gray immediately suggested that they take a drive in his car. During the drive, Stoudenmire complained to Gray about Womack's deplorable conduct, the picture taking incident, and inadequate training procedures.[1] Gray stated that he would immediately take care of the situations involving West and Womack. Upon return to the Double Diamond facility, Gray confronted Womack regarding the charges. Womack denied all of the allegations. Gray also confronted West. Gray told West to stop such activity and to apologize to Ross. West agreed to do both. After Gray spoke with Womack, Womack called Stoudenmire into his office and yelled at her for discussing his conduct with his supervisor instead of first contacting him.

For the remainder of Wednesday, Womack required Stuodenmire to continue her studying as a sales trainee in a separate room, away from the male trainees. In addition, Stoudenmire could not take her training material home at the end of the day. She had been allowed to take the material home in the past.

On Thursday, August 11, 1983, Stoudenmire once again was required to study alone, away from the other trainees who were studying together. During the day on Thursday, West spoke with Stoudenmire. West stated that he was sorry about taking the picture of Ross. He also stated that Womack "put him up" to taking the picture. At the end of the day, Stouden-mire was not permitted to take her studying materials home.

On Friday, August 12, 1983, Stoudenmire arrived at work around 9:00 a.m. She noticed that a full-time secretary was sitting at the desk which Ross was to occupy on that day. Shortly after she arrived, Womack informed Stoudenmire that Ray Wylie, the vice president of sales for Double Diamond, wanted to speak with Stoudenmire on the telephone. Stoudenmire went into Womack's office to receive the call. Wylie informed Stoudenmire that she was "barking up the wrong tree" and that "we know how to handle girls like you." Wylie also stated that if Stoudenmire pursued this claim any further she would lose her home and husband would lose his job. Wylie admitted that he spoke to Stoudenmire in a loud voice during this conversation. Stoudenmire left Womack's office in tears at the end of the conversation.

While Stoudenmire was in Womack's office, Ross entered the facility to report to work as she was supposed to do. Noticing that another secretary was at her desk, she requested to speak to Womack. At this point Stoudenmire exited Womack's office in tears. Stoudenmire and Ross called the Sheriff about the threats Wylie made to Stoudenmire and asked him to come over to the Double Diamond facility.

The Sheriff arrived at the Double Diamond facility fifteen minutes later. He spoke with Womack about the incidents which had been occurring. Womack brushed them off, stating that everyone was just having fun. After speaking with Womack, the Sheriff went into a separate building and spoke with West, Ross, Stoudenmire, and Karasek. West admitted to the sheriff that the picture taking incident had occurred and stated that he was sorry about it. In addition, West stated that Womack "put me up" to taking the picture.

The Court is mindful that West testified during the trial that Womack did not "put

---

1. Gray claimed that during this car ride, Stoudenmire unbuttoned her blouse. In a letter directed to the EEOC from the attorneys for Double Diamond, it states that Stoudenmire "dramatically pulled open her voluntarily-unbuttoned blouse with no bra underneath to reveal her breasts to Gray...." Based on all of the evidence presented, this Court finds that Stoudenmire did not unbutton her blouse or in any way make sexual innuendos to Gray.

me up" to taking the picture. West explained at trial that he said this in the past because he was mad at Womack. Womack was joking around with several salespersons. West was frustrated because he could not get Womack to attend to some business which needed prompt action.

After the meeting with West, the three ladies, Ross, Stoudenmire, and Karasek, went to Womack and requested to have the rest of the day off for personal reasons. Womack stated that if the three ladies left, their positions with the company would be terminated. The ladies chose to leave, and they were terminated.

The ladies went home and called the E.E.O.C. The following Monday, August 15, 1983, Ross, Stoudenmire, and Karasek went to the E.E.O.C. and filed charges. Ross and Stoudenmire never were paid for the work that they did at Canyon Creek.

Ten days later, on August 22, 1983, Annice Holliday interviewed with and was hired by Larry Womack to be a sales trainee at the Canyon Creek facility. Holliday was only 17 years of age at the time. Unfortunately, her experience during the first few days on the job was similar to that which Ross experienced. During the first day, Womack took her on a tour of the Canyon Creek facility. Womack asked Holliday to go into one of the mobile homes on the facility with him. Holliday refused to do so, to which Womack responded that she would soon learn to do what she was told.

On August 23, 1983, Holliday's second day on the job, Womack came into the office where Holliday was studying her training material. Womack put his arms around Holliday from the rear and grabbed her breast. Holliday responded by telling Womack that she was not a play toy. Womack again stated that she will do what she is told. On separate occasions, Womack also grabbed Holliday's behind. Holliday continued to work at Canyon Creek for three weeks hoping that conditions would improve. Conditions did not improve, and she quit. Double Diamond never paid her for any of the time that she worked at Canyon Creek.

In the early part of 1984, Womack voluntarily resigned from Double Diamond. Oliver Mowatt became the new manager at Canyon Creek. The sexual harassment continued under his reign. Mowatt hired Sonja Nichols as a secretary in the early part of 1984. On Nichols' second day on the job, Mowatt came up behind Nichols and touched her on her rearend. Nichols turned around and slapped Mowatt, to which he giggled and said excuse me.

Two days later, Mowatt walked up behind Nichols while she was typing. Mowatt knelt down and put his hand on Nichols' knee. As Nichols moved away, her dress came up. Again, Mowatt giggled and said excuse me. A few days later, Mowatt fired Nichols even though Mowatt's superior, Gray, had stated that Nichols was doing a fine job.

In April of 1984, Mowatt hired a 17 year old named Rene Cope to be a secretary at Canyon Creek. While in Mowatt's office, Mowatt patted her on the rearend and rubbed her back in a manner which she considered sexually offensive. In addition, the assistant manager, Jim Ackerman cornered her in Mowatt's office and tried to get her to kiss him. The evidence presented thus far is that which this Court may consider in determining whether the plaintiffs were subjected to a hostile work environment. The Sixth Circuit recently stated that in determining whether one has been subjected to a hostile work environment, the trier of fact may consider the "lexicon of obscenity that pervaded the environment of the workplace both before and *after* the plaintiff's introduction into the environs...." p. 16. Although this Court may not consider it in determining whether the plaintiffs were subjected to a hostile work environment, there was evidence of other lewd incidents which were introduced at trial which occurred at Canyon Creek as well as other Double Diamond facilities. For instance, a condom was placed on a bulletin board at Canyon Creek, pictures of female employees' faces were taped onto pictures which showed female genitalia and posted on the bulletin board at another Double Diamond facility. In addition, the evidence shows that some male managers, including Bob Gray and Ray Wylie, propo-

sitioned and/or touched female employees on their breasts and rearends.

*Applicable Law*

I. Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

In order to establish a claim for hostile work environment a plaintiff must prove the following:

(1) The employee belongs to a protected group. In this case, plaintiffs are females which is a protected group.

(2) The employee was subject to unwelcome sexual harassment. The evidence shows that both plaintiffs were subject to unwelcome sexual harassment.

(3) The harassment complained of was based upon sex, meaning but for a plaintiff's sex, she would not be subject to harassment. It is clear from the facts that this criteria is met since only females were subject to sexual harassment. If both females and males were subject to sexual harassment, this criteria would not be met.

(4) The harassment complained of affected a "term, condition, or privilege of employment." This criteria was satisfied as to Ross but not Stoudenmire. See below for a lengthy discussion of this criteria.

(5) Respondeat Superior, that the employer knew or should have known of the harassment and failed to take prompt remedial action. This element is also discussed below. *Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir.1986).

A. *Harassment Affected Term, Condition or Privilege of Employment (Fourth Requirement)*

A recent pronouncement by the United States Supreme Court addressed the breadth of Title VII with respect to sex discrimination. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In *Vinson*, the petitioners argued that Title VII only allowed a claim for a tangible loss of an economic character. *Vinson*, 106 S.Ct. at 2404. In other words, they argued that Title VII only protected against unwelcome sexual advances or requests for sexual favors which are a quid pro quo for the denial or grant of economic remuneration. *Id.* The Supreme Court rejected this narrow reading of Title VII and stated that Title VII also protects one from harassment which creates a hostile work environment. *Id.*

The Supreme Court noted: "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women.'" *Id.* (citations omitted) and further found that Title VII entitles all peoples in the American workforce to be free from "discriminatory intimidation, ridicule, and insult." *Id.* 106 S.Ct. at 2405.

In defining that type of sexual harassment which violates Title VII, the Court cites with praise, the EEOC guidelines promulgated under Title VII. *Id.* The EEOC defines sexual harassment to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature [which] has the purpose or effect of unreasonably interferring with an individual's work performance or creating an intimidating, hostile, or offensive working enviornment." 29 C.F.R. § 1604.11(a) (1986). However, the Supreme Court cautioned that for sexual harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Vinson*, 106 S.Ct. at 2406. (citation omitted).[2] This is the appropriate standard for determining

---

**2.** The Supreme Court quoted this phrase from the Eleventh Circuit in *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th cir. 1982). From *Henson* and the cases cited therein, it is clear that the phrase "conditions ... of employment" can refer to the enviornment in which the victim/employee is forced to work. *Id. Calcote v. Texas Educational Foundation, Inc.*, 458 F.Supp.

whether there is a "hostile work environment" as defined by Title VII.

The Supreme Court did provide assistance in applying the above standard. The Court stated that the trier of fact must determine whether sexual harassment existed in the workplace based upon the "totality of circumstances, 'considering such things as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Id.* 106 S.Ct. at 2407 (citing 29 C.F.R. § 1604.11(b) (1985)). The Court also emphasized that a claim is only actionable under Title VII if the sexual advances are "unwelcome." *Id.* 106 S.Ct. at 2406. Obviously, if the alleged victim welcomes the sexual advances, the employer should not be held liable for engaging in such conduct. In determining whether the alleged victim welcomed the sexual advances, the trier of fact should consider the alleged victims' speech, dress, and body movement. *Id.* 106 S.Ct. at 2407.

█ This Court is mindful that the Fifth Circuit has spoken on the concept of a hostile work environment created by race discrimination in *Rogers v. Equal Employment Opportunity Comm.'n.*, 454 F.2d 234 (5th Cir.1971). In *Rogers*, the Fifth Circuit stated that Title VII is intended to protect employees from "work environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." *Id.* at 238. This Court finds that the Supreme Court's decision in *Vinson* and other recent decisions by the Courts of Appeals indicate that the law under Title VII has progressed to a state where the Act protects employees from harassment which does not "destroy *completely* the emotional and psychological stability" of employees. (emphasis added). Although, of course, Title VII is not an impenetrable shield which protects employees from a mere utterance of sexual, ethnic or racial slurs which engender offensive feelings in the employees. *Id.* The EEOC guidelines, and the Courts of Appeals deci-

sions in *Bundy* and *Henson*, all of which were relied on by the Supreme Court in *Vinson*, do not mention the need for complete psychological debilitation in order for there to be a successful claim under Title VII. Basically what these sources are saying is that the trial court should look at the totality of the circumstances and determine whether the harassment is so egregious that it will create an abusive work environment. The abusive work environment, naturally can be created through psychological, emotional, or physical abuse.

1. *Examples of Conduct Which is Violative of Title VII*

In order to determine whether the conditions which Ross and Stoudenmire encountered at Double Diamond rises to the level of a Title VII claim, it would be useful to compare the conduct in the present case to that in cases where courts have found that a Title VII claim exists. In *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982), a female police dispatcher, Henson, worked for the City of Dundee for two years. During that period, the police chief "subjected [her] to numerous harangues of demeaning sexual inquiries and vulgarities...." In addition, the police chief inferred that he could arrange for Henson to attend a police academy if she were to have a sexual relationship with him. The police chief also requested Henson to have sex with him on several other occasions. Based on this evidence, the Eleventh Circuit stated that Henson made out a prima facie case under Title VII. The Eleventh Circuit's decision was cited with approval by the Supreme Court in *Vinson*.

In *Bundy v. Jackson*, 641 F.2d 934 (D.C. Cir.1981), a female vocational rehabilitation specialist, Bundy, for the D.C. Department of Corrections was sexually harassed. For approximately one year, two of Bundy's supervisors repeatedly propositioned her. One of them asked her about her sexual proclivities and tried to get her to come to his apartment during the afternoons. The

231, 237 (W.D.Tex.1976) (employer "made working conditions so intolerable tht the employee is forced to resign"); *Compston v. Borden, Inc.*,

424 F.Supp. 157, 158–61 (S.D.Ohio 1976) (attitude of supervisor made environment in which employee worked very difficult).

other asked her to join him at a motel and to go to the Bahamas with him. When the female reported the deplorable conduct of these men to their supervisor, he replied "[A]ny man in his right mind would want to rape you" and then he proceeded to request that she have sexual relations with him. The D.C. Circuit concluded that this conduct exemplified the type of discriminatory actions for which Title VII is the safeguard. The Supreme Court also cited this case with approval in *Vinson.*

One of the most recent proclamations on sex discrimination comes from the Seventh Circuit in *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986), which is only one of two Circuit Court decisions handed down after the *Vinson* decision. In *Scott,* a female trainee enrolled in an automobile training course. During the 12 week course, the manager asked her to go to a local restaurant with him. He also winked at her on several occasions and suggested that he give her a rubdown. The supervisor also asked the trainee what he would get if he gave her advise that she requested pertaining to the course. Surprisingly, the trainee admitted that the supervisor was generally nice to her and that she considered him a friend. The female also alleged that one of the mechanics had slapped her on the buttock and another had told her that she must moan and groan while having sex. The Seventh Circuit stated that the comments by the supervisor were not so "pervasive and psychologically debilitating that they affected [the female's] ability to perform on the job." In addition, the Court stated that the comments and conduct of the mechanics was "too isolated and lacked the repetitive and debilitating effect necessary to maintain a hostile environment claim." The Seventh Circuit referred to the conduct in *Vinson, Henson,* and *Bundy* as examples of the type of conduct which is violative of Title VII.

### 2. *Factors to Consider in Determining Whether There is a Hostile Work Environment*

This Court finds that the *Vinson* decision along with *Henson, Bundy, Scott,* and a brand new decision by the Sixth Circuit, *Rabidue v. Osceola Refining Company,* 805 F.2d 611 (6th Cir.1986) provide the guidance for this Court to determine whether a hostile work environment exists in the present case. In order for a plaintiff to be successful in a claim for hostile work environment, the plaintiff must prove "that the defendant's conduct would have interfered with a reasonable individual's work performance and would have affected seriously the psychologically well-being of a reasonable employee" and "demonstrate that she was actually offended by the defendant's conduct and that she suffered some degree of injury as a result of the abusive ... work environment." *Rabidue,* 805 F.2d at 620.

Based on the present case law, this Court believes that there are four factors which a trial court should consider in determining whether the above criteria is met. First, a court should consider the nature of the unwelcome sexual acts or words.[3] Generally, unwelcome physical touching is more offensive than unwelcome verbal abuse. However, this is only a generalization and in specific situations the type of language used may be more offensive than a type of physical touching. Second, a court should consider the frequency of the offensive encounters.[4] It is less likely that a hostile work environment exists when, for instance, the offensive encounters occur once every year than if the encounters occur once every week. Third, the Court should consider the total number of days over which all of the offensive meetings

---

**3.** *Vinson,* 106 S.Ct. at 2406. (Supreme Court stated that the conduct must be sufficiently "severe" to alter the conditions of employment or to create an abusive work environment.); *Rabidue,* 805 F.2d at 620. (consider "nature of alleged harassment")

**4.** *Vinson,* 106 S.Ct. at 2406. (Supreme Court stated that the conduct must be sufficiently "pervasive" to alter the conditions of employment or to create an abusive work environment.")

occur.[5] Lastly, the court should consider the context in which the sexually harassing conduct occurred.[6] The Court emphasizes that none of these factors should be given more weight than the others. In addition, the nonexistence of one of these factors does not, in and of itself, prevent a Title VII claim. As stated above, the trier of fact must consider the "totality of the circumstances."

█ Because of its importance in this case, the Court chooses to elaborate on the reasons why a short duration of sexual harassment does not obviate a Title VII claim. The courts are looking for a "pattern of sexual harassment inflicted upon an employee because of her sex" because this type of activity "is a pattern of behavior that inflicts disparate treatment upon a member of one sex with respect to terms, conditions, or privileges of employment." *Henson*, 682 F.2d at 902. Sexual harassment need not exist over a long period of time for it to be considered a pattern. If the sexual harassment is frequent and/or intensely offensive, a pattern can be established over a short period of time.

The United States only recently has recognized the widespread nature of sexual harassment in the workplace. *See* Sex Discrimination in the Workplace, 1981, Hearing Before the Senate Comm. on Labor and Human Resources, 97th Cong., 1st Sess. 336, (1981) (statement of J. Clay Smith, Jr., acting chairman of EEOC). In conjunction with this recognition, the courts have begun to give a broader scope to the areas of sexual harassment which fall under Title VII. This Court submits that it would be inconsistent with this new awakening to allege that a human being who has been intensely sexually harassed at the workplace does not have a claim under Title VII because the human being did not stay on the job for a longer period of time and subject himself or herself to further degradation. As the Eleventh Circuit so aptly put it: "Surely, a requirement that a man

or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." *Henson*, 682 F.2d at 902.

### 3. *Discussion Regarding Hostile Work Environment*

#### a. *Beverly Ross*

█ The Court finds that the acts and communications perpetrated against Ross at Double Diamond are sufficiently severe or pervasive to alter the conditions of Ross' employment and create an abusive work environment. The Court finds that an analysis of the four factors presented above support this conclusion.

First, the Court will look at the frequency of the offensive encounters. The Court is mindful that the sexual abuse began on Ross' very first day on the job. Along with the general insecurity and awkwardness that accompanies anyone's first day on the job, Ross was forced to deal with the lewd comments and actions of her superiors. For instance, during her first *hour* at work Womack asked Ross whether she "fooled around." Ross did nothing to provoke or encourage such a comment. Womack had just met Ross for the first time on the previous day when he interviewed her for the job.

During the same morning, Womack forced Ross into another uncomfortable situation by telling her to pull up her dress so that he could take a picture of her. Ross stated that she was scared of Womack at this point and tried to pacify Womack while retaining her dignity by just pulling the dress up two inches to her knees. At two other times during the day, Womack called Ross on the telephone and asked her to pant heavily.

The culmination of a humiliating first day on the job occurred during the evening sales meeting when Ross entered the meet-

---

5. *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir.1986) ("repetitiveness" is factor to consider in a hostile environment claim).

6. *Vinson*, 106 S.Ct. at 2407 (citing 29 C.F.R. § 1604.11(b) (1985)) (consider "context in which the alleged incidents occurred"; *Rabidue*, 805 F.2d at 620. (look at "totality" of the physical environment of the plaintiff's work area).

ing to deliver a message to one of the salesmen. When Ross was standing next to Womack, another salesmen, West, placed a camera on the floor under Ross and took a picture up her dress. Although West changed his story at a later date, on two separate occasions during the week after this incident, West stated that Womack "put me up" to taking the picture. One of the times that West stated this was to a local sheriff who was investigating the incident. Regardless of whether West did it under his own volition or under the direction of Womack, such conduct typifies the severity of the conditions and the atmosphere under which Ross was forced to work.

The torment which Ross experienced continued during the time period when Ross was not in direct contact with Womack. Ross specifically requested the two polaroid pictures which Womack had in his possession. Womack refused to give the pictures to Ross and refused to even allow Ross to see the pictures. This caused Ross great torment. She did not know how revealing the picture was that the salesman took up her dress. In addition, Ross certainly did not want Womack, who had been acting in a perverse manner, to have any pictures of her.

The attacks did not let up on Ross' second day on the job. Rather, they became worse as Womack began to physically touch Ross. Shortly after Ross arrived in the morning, Womack pulled Ross onto his lap at his desk. Fortunately for Ross, one of the salesmen entered Womack's office, and it was only at that time that Womack let go of Ross. The salesman testified that Womack looked perverted while holding Ross. During the afternoon, Womack trapped Ross in his office as she tried to escape after Womack requested her to bend over and clean up some mustard on the wall of his office.

As previously stated, the second factor that the Court will consider is the intensity of the offensive encounters. The above scenario illustrates that the humiliation that Ross experienced became progressively worse over the two day period: from offensive comments on the morning of the first day to the intrusive photograph up Ross' dress during the evening of the first day and finally to the profane physical touching on the second day. Note that in both Henson and Bundy, cases relied upon by the Supreme Court in Vinson, there was no physical touching and yet the Circuit Courts found that there was a violation of Title VII. In the present case, Womack laid hands on Ross on two separate occasions on the same day even though it was abundantly clear that Ross was not interested in such touching.

The third factor that the Court will consider is the duration of the offensive encounters. Admittedly, the duration of the encounters was extremely short—two days. However, as stated at the beginning of this discussion, a short duration of abuse does not automatically mean that a Title VII action fails. If the intensity and frequency of the offensive encounters are strong enough, there can still be a valid claim under Title VII. As stated earlier, the offensive encounters intensified over the two day period. In addition, the frequency of the encounters was great. Most of the times that Ross interacted with Womack, there was a sexually harassing experience. The Court finds that these factors render the duration factor less important than it might be in other sex discrimination cases.

Finally, the Court will consider the context under which the sexual harassment occurred. All of the incidents of harassment which plaintiffs experienced occurred on the premises of Double Diamond during working hours. The incidents to which the other female employees of Double Diamond were subjected also occurred during working hours. None of the females who testified felt that the physical touching was in jest or was brought on by their actions. In addition, many of the victims were young, between the ages of seventeen and twenty three. The plaintiffs were twenty and twenty three years old. However, the managers who committed the acts were in their thirties or fourties. This type of situation lends itself to a finding that there was an abusive work environment.

After considering the "totality of the circumstances," and particularly the four ar-

eas listed above, this Court finds that the work performance and psychological well-being of a reasonable individual would be seriously affected if confronted with the kind of abuse to which Ross was subjected. In addition, this Court finds that Ross was degradated because of being exposed to this kind of torment and that her psychological well-being was seriously impaired because of this exposure.

### b. *Sheila Stoudenmire*

There are basically four situations which Stoudenmire claims to give rise to a claim under Title VII. First, Womack suggested that she wears black boots and carries a whip in the bedroom. Second, she was segregated from the male employees who were also training to be sales persons on three separate days. Third, she was not permitted to take her training books home with her at night after she complained about the treatment she and Ross received at Canyon Creek. Lastly, she objects to the threats which Wylie made to her.

Title VII is not a shield which protects people from all sexual discrimination. *Rogers*, 454 F.2d at 238. The type of conduct listed above does not rise to the level of harassment which is actionable. It is not sufficiently severe and pervasive to alter the conditions of employment or create an abusive work environment.

### II. *Respondeat Superior*

The final criteria which a plaintiff must prove in order to have a successful claim for abusive work environment is that the employer knew or should have known of the harassment in question and failed to take prompt remedial actions. The Court finds that the plaintiffs met this element.

Before Womack was the manager at Double Diamond's Canyon Creek facility, he was a salesman at Lakewood Properties, another Double Diamond facility. During March of 1983, a female employee of Double Diamond filed a charge with the E.E.O.C. alleging that she was sexually harassed by Womack at Lakewood. Double Diamond settled that suit in July of 1983 before it went to trial by paying the female employee $200.00. After this inci-

dent, Gray talked to Womack who claimed that he did nothing to sexually harass the female employee. However, the Court finds that Double Diamond was placed on notice from this incident that Womack and/or other Double Diamond employees may have been sexually harassing female employees. In addition, Double Diamond should have taken the opportunity to implement an effective policy against sexual harassment which they agreed to do in settling the case with the E.E.O.C. Double Diamond did introduce at trial a two sentence memo which merely stated: "As has always been Double Diamond Companies [sic] Policy, there is to be no Sexual Harassment or Innuendos as a condition of employment, promotion, or hire. This applies to all Company Employees." (Defendant's Ex. 22) This is not a policy against sexual harassment. It does not provide a means for employees to complain about harassment nor does it provide a means to deal with such complaints. In addition, several of the females who testified claimed that they had never seen this memo. The agreement with the E.E.O.C. required Double Diamond to "deliver" a policy to all employees.

Relating specifically to the incidents to which Ross was subjected, the Court finds that remedial measures were almost non-existent. First, the person who did most of the sexual harassment, Womack, was an agent and supervisory employee of Double Diamond. When Ross protested to Womack about his exploits, Womack did not pay attention. In fact, he refused to give her the humiliating pictures of herself. In addition, he allowed the salesmen access to the picture taken up Ross' dress. Second, when Stoudenmire complained about the conduct to which she and Ross were subjected, she was verbally harassed by members of management. Womack yelled at her for going over his head when she spoke with Gray. Moreover, Wylie threatened her by saying that she would lose her home and that her husband would lose his job if she pursued the matter. In sum, it is clear to this Court that Double Diamond did not respond effectively to the plaintiffs' complaints regarding the conduct to which Ross was subjected.

### B. Liability of Double–Diamond (Fifth Element)

#### 1. Standard to Use in Determining Employer Liability

The law in the area of employer liability for the sexual harassment which one employee inflicts upon another employee is still developing. There are basically two situations which need to be addressed: first, whether the employer should be liable when a supervisory employee or an agent of the employer commits the sexual harassment; and second, whether an employer should be liable when other employees sexually harrass co-employees. The law pertaining to the first area is more developed and it is the area into which the present case falls. Thus, it is the only area to which this Court will address itself.

■ The majority in *Vinson* chose not to address the standard to use in either of the above situations. The four member concurrence, however, found that the issue was properly in front of the Court and chose to provide a standard for determining employer liability. The concurrence chose to adopt the standard presented by the Equal Employment Opportunity Counsel (EEOC), which provides:

Applying general Title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The Commission will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in either a supervisory or agency capacity.

With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

29 C.F.R. §§ 1604.11(c), (d) (1986). The above guideline imposes strict liability on employers for the acts of sexual harassment committed by supervisory employees.[7] Every Circuit Court which has addressed this issue has agreed with this standard. *Vinson*, 106 S.Ct. at 2410 (Marshall, J., concurring).

As stated earlier, in the present case we are considering employer liability based upon the actions of a supervisory employee. Womack was the manager of the Canyon Creek facility for Double Diamond and had the power to hire and fire employees at that facility. An individual with this authority is considered a supervisory employee or agent for purposes of Title VII. *Vinson v. Taylor*, 753 F.2d 141, 150 (D.C.Cir. 1985). Thus, the sexual harassment committed by Womack is imputed on Double Diamond, and it, too, is liable under Title VII.

### III. Claim of Retaliatory Discharge by Ross and Stoudenmire

■ In order to make out a prima facie case of retaliatory discharge, a plaintiff must show (1) that she engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision. *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986); *Jones v. Flagship Int'l*, 793 F.2d 714, 724–26 (5th Cir.1986) (thorough discussion of the burden of proof in retaliatory discharge case). If no legitimate, nondiscriminatory reason for the defendant's actions exists, or if the plaintiff can show any reason proferred by defendant to be merely a pretext for discrimination, then Title VII liability results.

As stated above one must show that she engaged in an activity protected under Ti-

---

**7.** For an excellent discussion of the merits of using this standard, see *Horn v. Duke Homes, Inc., Div. of Windsor Mobile Homes*, 755 F.2d 599, 603–06 (7th Cir.1985); *Vinson v. Taylor*, 753 F.2d 141, 147–52 (D.C.Cir.1985).

tle VII in order to meet the first requirement. Section 704(a) of Title VII provides, in pertinent part, that it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, ..." In order for an action to be protected by section 704(a), this Circuit requires the trial court to consider whether the employee's conduct was reasonable in light of the circumstances. *Flagship,* 793 F.2d at 728 (citing cases). The trial court also must balance the employer's right to run his business with the rights of employees to express their grievances. *Id.*

This Court finds that the plaintiffs in this case did engage in protected activity under Section 704(a). First, both plaintiffs objected to the treatment to which they were exposed. They contacted the local sheriff and they spoke with authorities at Double Diamond, in particular, Bob Gray, a regional sales manager, and Ray Wylie, the vice president of sales. Second, the Court finds the means by which the plaintiffs expressed their complaints were reasonable in light of the circumstances. It was reasonable for the three ladies to complain to the sheriff about the treatment to which Womack had subjected them, and in particular, the offensive encounters which Ross faced. Womack was the top management person at the Canyon Creek facility, and since he was the central figure involved in the harassment, it was logical for the ladies to turn to the local sheriff. On the following day, Wednesday, August 10, 1983, Stoudenmire and Karasek did not cause any disturbance when they requested to speak with Larry Womack's superior, Bob Gray. They went for a car ride with Gray during which time they voiced their complaints.

Finally, Stoudenmire's contacting the local sheriff on Friday, August 12, 1983 after being threatened on the telephone was very reasonable. None of the actions taken by the plaintiffs caused any significant interference with Double Diamond's ability to run its business at Canyon Creek. Stoud-

enmire was still in training to be a salesperson, and the full-time secretary for whom Ross substituted was at the office. Accordingly, the Court finds that the plaintiffs have satisfied the balancing test because they exercised their right to object to unlawful employment practices in a reasonable manner which caused minimal, if any, disruption in Double Diamond's ability to run its business.

The Court finds that the plaintiffs have also satisfied the second requirement for a prima facie case of retaliatory discharge since it is clear that being terminated from their employment is an adverse employment action.

Finally, the Court finds that there was a causal link between the protected activites and the plaintiff's termination. Womack was very upset with the plaintiffs, as is reflected in the fact that he called Stoudenmire into his office and yelled at her for complaining to Bob Gray about his own deplorable activity and by the fact that he told Wylie that Stoudenmire was a ring leader. Furthermore, after Stoudenmire began to complain about the conditions at Canyon Creek, Wylie yelled at Stoudenmire on the telephone. The evidence shows that Wylie threatened Stoudenmire by stating that Double Diamond management would say that she tore off her blouse while she was in Gray's car and tried to have Gray make love to her if she "did anything about" the sexual harassment. Wylie's threats during this conversation continued as he told Stoudenmire that she was "barking up the wrong tree" and that "we know how to handle girls like you." Wylie also stated that Stoudenmire and her husband would lose their home and that her husband would lose his job if she pursued the claims of sexual harassment.

In addition, the plaintiffs had only been employed at Double Diamond for a few days, and there is not evidence that the plaintiffs had engaged in any activity which would subject them to a possible termination other than complaining about conduct which they considered to be discriminatory. Finally, Double Diamond management was aware that Stoudenmire,

Ross, and Karasek had contacted the Sheriff on Tuesday, August 9, 1983, and that the Sheriff came out to Canyon Creek during the morning of Friday, August 12, 1983 to investigate the threats against Stoudenmire and the claims of sexual harassment. From viewing the witnesses on the stand, this Court finds that Stoudenmire was much more assertive than Ross. Stoudenmire is Ross' older sister, and she was resolved to protecting both herself and Ross.

Thus, based on the above stated evidence, this Court finds that Double Diamond management was highly agitated by the complaints of Ross and Stoudenmire about the sexual harassment and that the complaints of Ross and Stoudenmire caused Womack to fire them. There is no reason, other than retaliation, for the dismissal of Ross and Stoudenmire. In sum, the Court finds that the plaintiffs made out a prima facie case of retaliatory discharge.

Defendants are able to rebut this prima facie case by introducing testimony of a legitimate, nondiscriminatory reason for discharging the plaintiffs. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973). The Court finds that the defendants did rebut the plaintiffs' prima facie case by alleging that Womack fired the plaintiffs because they wanted to take off the remainder of Friday, August 12, 1983, for personal reasons without the permission of their supervisor, Womack.

If defendants successfully rebut the plaintiffs' prima facie case, as the defendants did in this case, plaintiffs can still be successful in the suit if they demonstrate that the proffered reason for plaintiffs' termination is merely a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1980); *See also, Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986). "This burden now merges with the ultimate burden of persuading the Court that she has been the victim of intentional discrimination. She

may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employers' proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The Court finds that the proffered reason by the defendants is not worthy of credence. The evidence at trial showed that shortly before the incidents involved in this case Larry Womack allowed other sales trainees to take off time for personal reasons. In addition, it is clear that it was not particularly important for the plaintiffs to be at Canyon Creek on Friday, August 12, 1983. The full-time secretary, whom Ross was to replace on the weekends, was in the office on Friday. In fact, she was sitting at her (Ross') desk when Ross entered the office on that day. Stoudenmire was still a sales trainee on this day, and thus, it was not imperative that she be present to show prospective clients around the premise. She was not yet prepared to do this. Finally, the unacceptable conduct to which Stoudenmire was subjected after she complained about the sexually harassing conduct, namely, both Wylie and Womack yelling at her, makes it clear that Womack was not pleased with the presence of the plaintiffs at Canyon Creek. Based on the totality of these reasons and the overall atmosphere which was pervasive at Double Diamond facilities, the Court finds that defendants' proffered reason for terminating the plaintiffs is not worthy of credence. Thus, the evidence shows that the proffered reason for the plaintiffs' termination was merely a pretext for discrimination.

In sum, the Court finds that plaintiffs have made out a claim for retaliatory discharge under Title VII.

## IV. *Remedies*

■ Courts have discretion under Title VII to award a victorious plaintiff back pay, reinstatement, and "any equitable relief as the court deems appropriate." 42 U.S.C. § 2000–5(g) (1976) [8]. Plaintiffs in-

---

**8.** One Court has indicated that a plaintiff who is successful on a claim of hostile work environ-

ment may receive injunctive relief, but may not recover back pay and reinstatement. *Bundy v.*

troduced evidence at trial as to the back pay to which Ross was entitled for the period of August 7, 1983 through May 30, 1984. This is the only period for which Ross requests back pay. The evidence shows that Ross' income at Double Diamond for this period would have been $3,412.50. (Plaintiffs' Exhibit 10). After deducting the income which Ross actually received during the same period as reflected by her W–2 forms, this Court finds that Ross is entitled to a net back pay of $3,065.98. This amount includes interest calculated at 6% through date of trial. The Court finds that Ross should be awarded this amount, and orders Double Diamond to pay such to Ross. Plaintiffs also introduced evidence at trial that Stoudenmire is entitled to $37,244.52 in back pay for the period from August 8, 1983 through July 1, 1985. This is the only period for which Stoudenmire requests back pay. In deriving this figure, plaintiff assumed that Stoudenmire would receive $25,000.00 per year, which is the amount that Double Diamond advertised as its salespersons' average annual income. The Court finds this amount to be excessive because most, if not all, of Stoudenmire's income would have been made on commissions. The Court finds that it is more appropriate to calculate Stoudenmire's back pay based on an income of $300.00 per week. This figure is arrived at by adding the $200.00 per week draw which Stoudenmire was to receive with an estimate that Stoudenmire would receive an additional $100.00 in commission. Based on the assumption that Stoudenmire would receive $300.00 per week, this Court finds that Stoudenmire's income at Double Diamond would have been $29,700.00 for the period of August 8, 1983 through July 1, 1985. After deducting the income which Stoudenmire actually received during the same period as reflected by her W–2 forms (Plaintiffs' Exhibits 13 and 13A), this Court finds that Stoudenmire is entitled to a net back pay of $18,025.00, which includes interest calculated at 6% through the date of trial.

Jackson, 641 F.2d 934, 946 n. 12. (D.C.Cir. 1981). Since this Court finds that Ross and Stoudenmire were successful on their claim for

Injunctive relief generally should be granted in Title VII cases unless there is no reasonable expectation that the discriminatory conduct will recur, United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), or if interim events have "completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). There is no indication that either of these situations exists. First, there was several incidents of sexual harassment which occurred at Double Diamond facilities other than the one at Canyon Creek where plaintiffs were employed. In addition, Double Diamond does not have an effective preventive system to assure that sexual harassment will not occur in the future. Thus, this Court finds that it is appropriate to impose injunctive relief in the present case.

This Court orders that Double Diamond implement a comprehensive system to safeguard against all kinds of discriminatory conduct. The preventive system which Double Diamond implements must conform with the E.E.O.C. Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a)-(f). In addition, Double Diamond should consider the suggestions for implementing such a system in Bundy v. Jackson, 641 F.2d 934, 947–48 (D.C.Cir.1981). Defendants should be particularly mindful of encorporating within the preventive system a means of educating employees as to their right to work in an environment free of discriminatory conduct; a means for employees to make an intra-company complaint regarding violations of Title VII; and a means for promptly and effectively dealing with these complaints. Double Diamond's proposal shall be submitted to this Court for approval by May 15, 1987.

V. Claim of Constructive Discharge Under Title VII by Ross and Stoudenmire

The Court finds that plaintiffs did not make out a claim for constructive

retaliatory discharge, as well as on their claim for hostile work environment, this limitation is not applicable in this case.

discharge under Title VII. "Constructive discharge occurs when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Pittman v. Hattiesburg, et al.,* 644 F.2d 1071, 1077 (5th Cir.1981) (citing *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). To find constructive discharge, the Court must find that a reasonable person in the employee's position would have felt compelled to resign. *Id.* (citing *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980)). The Court finds that the plaintiffs did not make out a claim for constructive discharge since the plaintiffs failed to prove an essential element of such a claim, namely, that the plaintiffs actually resigned. The evidence shows that Womack fired the plaintiffs on August 12, 1984 and not that the plaintiffs resigned.

In sum, plaintiffs did not make out claims for actual or constructive discharge under Title VII.

## VI. *Attorneys' Fees*

The Court may also award attorneys fees to plaintiffs Ross and Stoudenmire if they are "prevailing parties" under 42 U.S.C. § 2000e–5(k). The Fifth Circuit has adopted a stringent standard for determining whether a plaintiff is a "prevailing party" under 42 U.S.C. § 2000e–5(k). A plaintiff is a "prevailing party" if "the plaintiff has been successful on the central issue as exhibited by the fact that he has acquired *the primary relief sought.*" *Cervantez v. Whitfield,* 776 F.2d 556, 562 (5th Cir.1985) (quoting *Iranian Students Ass'n. v. Edwards,* 604 F.2d 352, 353 (5th Cir. 1979)) (emphasis in original).[9] As discussed in this opinion, plaintiffs brought

9. This Court wishes to express some problems which it has with this stringent standard for determining who is a "prevailing party." The attorneys' fee provision which is applicable in Title VII cases, 42 U.S.C. § 2000e–5(k), was enacted in 1964 as part of the Civil Rights Act of 1964. The attorneys' fee provision which applies to other civil rights cases, 42 U.S.C. § 1988, was enacted in 1976.

The legislative history for 42 U.S.C. § 1988 is valuable in determining how Congress intended for § 2000e–5(k) to be applied. First, Congress intended for the language of both attorney fee provisions to be very similar. In addition, the legislative history to § 1988 indicates that Congress wanted § 1988 and § 2000e–5(k) to be applied in a similar manner. S.Rep. No. 94–1011, 94th Cong., 2nd Sess, 4, Reprinted in [1976] U.S.Code Cong. & Adm.News 5908, 5912. Furthermore, the courts have applied the same analysis to determining whether one is a "prevailing party" under § 2000e–5(k) and § 1988. *See e.g., Cervantez v. Whitfield,* 776 F.2d 556, 562 (5th Cir.1985).

The legislative history specifically recognizes that many plaintiffs in civil rights cases have little or no money. *Id.* at 5910. In recognition of this fact, the legislative history goes on to state that if a private citizen successfully brings suit and forces one to cease violating the Civil Rights laws, then the citizen should be able to recover the costs to vindicate civil rights. The legislative history then goes on to make it clear that the purpose of allowing a successful plaintiff to recover attorneys' fees is to create "private attorney generals" who will vigorously enforce the civil rights laws. *Id.* at 5911.

This Court believes that allowing plaintiffs to recover attorneys' fees only if they succeed on *the central issue* in the case as exhibited by

obtaining the primary relief sought is too stringent in light of Congress' clear intent to have private citizens play a "significant role" in enforcement of the civil rights laws. *Id.* at 5910. For instance, this standard would not award attorneys' fees if plaintiff was successful on one claim i.e., hostile work environment, in a multi-claim suit under the civil rights laws where plaintiff could not get the primary relief which he wanted on that one claim, i.e., under hostile work environment, one cannot receive back pay or reinstatement which generally is the primary relief sought. *Bundy,* 641 F.2d at 946 n. 12. In this situation, a plaintiff would be successful in vindicating a civil rights violation but not receive attorneys' fees for doing so because he happened to not receive the primary relief he sought. Not allowing attorneys' fees when the plaintiff is successful on this one claim appears to be inconsistent with the legislative history outlined above which states that the purpose for awarding attorneys' fees is to encourage private citizens to bring suits to vindicate violations of the civil rights laws.

This Court encourages the use of a standard which is used by the majority of Circuit Courts and which has been quoted with approval by the Supreme Court, namely, "plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on *any significant issue* in litigation which achieves *some of the benefit* the parties sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1982) (emphasis added). This standard, it is submitted, is more consistent with the legislative intent of allowing attorney's fees in civil rights cases.

three separate claims under Title VII—retaliatory discharge, constructive discharge and hostile work environment. In relation to these claims, plaintiffs sought reinstatement, backpay, frontpay, nominal damages, and injunctive relief. Plaintiff Ross has prevailed on her hostile work environment claim, for which this Court has granted her injunctive relief. Plaintiffs Ross and Stoudenmire have prevailed on their retaliatory discharge claim, for which this Court granted Ross and Stoudenmire reinstatement if they so desire, and back pay.

A determination of whether a plaintiff succeeded on the central issue in the case is not made by simply counting up the number of claims on which the plaintiff succeeded and comparing that to the number of claims on which the plaintiff did not succeed. Rather, this determination should be made by considering the record as a whole, and determining from the record whether the plaintiff received the primary relief which they sought. It is clear that plaintiffs received the primary relief sought since they obtained reinstatement, back pay and injunctive relief. Thus, the Court shall award attorneys fees to the plaintiffs. In assessing attorney fees, the Court will consider the factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).

The Court requests plaintiffs' attorneys to submit affidavits, supported by time sheets, and other applicable documents in connection with the prosecution of this case which itemize the number of hours spent on particular matters in this case by May 15, 1987. Defendants may make any objections to plaintiffs' attorneys fees on or before June 1, 1987.